### LANE et al. v. URBAHN. (No. 7531.) *

(Court of Civil Appeals of Texas. San Antonio. Nov. 24, 1926. Rehearing Denied Dec. 15, 1926.)

**1. Mines and minerals ⬅⇒58—False representation of intention by lessee to develop oil land held not actionable fraud, in action to cancel lease.**

Alleged false representation that lessee of oil lease intended, in good faith, to develop land for oil and gas, was too general to constitute actionable fraud, in action to cancel lease.

**2. Mines and minerals ⬅⇒58—To cancel lease for false representation, there must be representation of particular fact relied on by plaintiff.**

False representation or promise, to constitute ground for cancellation of oil lease, must be specific, asserting particular fact relied and acted on by plaintiff.

**3. Contracts ⬅⇒94(6)—Representation of intention to perform contract adds nothing to duties of parties resting on them by presumption.**

Prior parol representations and promises of parties to contract that they intend in good faith to perform obligations of contract add nothing to duties or liabilities resting on them by presumption, since good faith and intention of party to perform contract is presumed as matter of law.

**4. Mines and minerals ⬅⇒58—Present intention not to develop oil lease, and substantial failure to perform, must be shown to establish actionable fraud in lessee's promise to develop.**

To establish actionable fraud by false promise of lessee that he would develop oil lease in good faith, lessor must show present intention not to develop lease at time promise was made, and subsequent substantial failure to develop lease.

**5. Mines and minerals ⬅⇒58—Proof that lessee substantially performed lease rebuts charge that he never intended to perform.**

Charge of fraud by lessee in promising to develop oil lease in good faith was not sustained under proof that lessee promptly commenced development of land, and substantially performed until stopped by lessor.

**6. Mines and minerals ⬅⇒58—Oil lease held not shown to have been procured through false representation that lessees were owners of corporation that would develop lease.**

Alleged fraudulent representation by procurers of oil lease that they were owners of corporation through which they intended to provide money for development of leased premises held not sustained by evidence showing lessor's reliance on individual promoters of corporation not then organized, who supplied their individual funds to operate under lease.

**7. Mines and minerals ⬅⇒58—Oil lease held not shown to have been procured by false representation that corporation to develop was already organized.**

In suit to cancel oil lease, alleged fraudulent representation by procurers of lease that corporation to develop premises was already organized, when in fact no such corporation was in existence, held not sustained by evidence.

**8. Mines and minerals ⬅⇒78(1)—Lessor held estopped to complain of lessee's breach of agreement to commence well within six months.**

Lessor, failing to complain of lessee's delay in drilling well within time prescribed in lease, and permitting drilling to continue, is estopped to complain of breach of provision of lease requiring lessee to use all reasonable efforts to commence well within six months.

**9. Mines and minerals ⬅⇒58 — Evidence that procurers of oil lease were able to carry out lease held not to show actionable fraud in representation as to their wealth and experience.**

Representation that procurers of oil lease were experienced oil developers, who had sold out prior holdings for $34,000,000, and were able to hazard large sums in exploring oil land, held not ground for actionable fraud in procuring lease, where promoters were shown to be financially able to perform obligations imposed by lease.

**10. Mines and minerals ⬅⇒74—Lessee held to have unrestricted privilege of assigning oil lease giving either party privilege of assigning in whole or in part.**

Oil lease granting either party privilege of assigning in whole or in part held to give lessee unrestricted privilege of assigning lease as he chose to divide it, and to whomsoever he chose.

**11. Mines and minerals ⬅⇒74—Original lessee's performance of oil lease inures to benefits of partial assignees, who are not required to perform until assignor defaults.**

Performance by original lessee of oil and gas lease of obligations imposed on him in contract inures to benefit of his assigns, to whom parts of lease may be sold, and who are not re-

quired to actively perform lease until assignor defaults.

**12. Mines and minerals ☞58—Promise not to freely assign lease to persons financially unable to develop lease held not material representation in procuring lease.**

Promise by procurer of oil lease that unrestricted right of assignment given in lease would not be freely exercised as to assign to those financially unable or not intending to develop lease *held* so remote and speculative as to deprive it of force of material representation in procuring lease.

**13. Mines and minerals ☞74—Written contract expressly granting right to assign lease in whole or in part merged prior oral promise as to assignment.**

Parol agreement not to indiscriminately exercise unrestricted right to assign oil lease *held* to have been merged into final agreement expressly giving either party right of assignment in whole or in part.

**14. Mines and minerals ☞58—Right to complain of representation that lessee would not exercise privilege of assigning oil lease in full held waived by lessor.**

Lessor, knowing that original lease gave lessee unrestricted privilege of assignment, and that same provision was carried into substituted lease, thereby waived right to complain of representation that lessee would not exercise privilege in full.

**15. Mines and minerals ☞74—Oil lease giving lessee unrestricted privilege of assignment held affirmed by lessor requiring lessee to guarantee performance by its assigns.**

Lessor, demanding clause in lease that lessee guarantee performance of obligation by its assigns, *held* to have recognized and affirmed stipulation in lease giving lessee unrestricted privilege of assignment.

**16. Mines and minerals ☞74—Assignees of lessee held not bound by clause whereby lessee guaranteed performance by his assignees.**

Oil lease requiring lessee to guarantee performance by its assigns *held* not extended to assignees so as to impose obligation on them to develop lease.

**17. Mines and minerals ☞78(2)—Oil lease held not subject to cancellation for breach by lessee of clause guaranteeing performance of lease by its assigns.**

Lessor, placing clause in oil lease whereby lessee guaranteed performance of lease by its assigns, is not warranted in canceling lease for breach of such clause by lessee.

**18. Mines and minerals ☞59—Condition of internal affairs of lessee corporation is no grounds for canceling lease, so long as obligations of lease are being performed.**

In suit to cancel oil lease, lessor cannot complain of loose manner in which lessee corporation conducts its internal affairs, or keeps its books and minutes, or failure to comply with laws of state of its creation, so long as officers are supplying funds and performing obligations of lease.

**19. Mines and minerals ☞108—Lessor of oil lease cannot complain of lessee corporation's failure to comply with laws of state of its creation.**

Failure of lessee corporation to comply with laws of state of its creation can be complained of only by government of that state, and not by lessor, at least not until he has suffered injury by reason of unlawful acts.

**20. Corporations ☞30(1)—Acts of incorporators in performing lease inure to benefit of lessee corporation.**

Acts done by incorporators in performing obligations of lessee corporation are done in behalf of corporation, and inure to its benefits.

**21. Mines and minerals ☞107—Oil lease cannot be canceled because lessee corporation has become defunct, and forfeited charter since institution of suit.**

That lessee corporation has become defunct, and charter forfeited since institution of suit to cancel oil lease, does not warrant cancellation or abatement of right of defense, since corporation may be reinstated and may defend suit to final judgment after forfeiture.

Cobbs, J., dissenting.

Appeal from District Court, Webb County; J. F. Mullally, Judge.

Action by Albert Urbahn against L. M. Lane and others. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

Hicks, Hicks, Dickson & Bobbitt, of San Antonio, for appellants.

J. D. Dodson, of San Antonio, for appellee.

SMITH, J. This is the third appeal in this cause. 246 S. W. 1070; 265 S. W. 1063. The facts are so fully stated in former opinions that they will not be restated here except as they relate to the particular matters discussed. The suit was brought by Albert Urbahn, the lessor, against the Rio Grande Oil & Gas Company, an Oklahoma corporation, the lessee, and its stockholders and directors, for damages and for cancellation of an oil and gas lease covering a 53,000-acre ranch in Webb county. The lease contract was in the usual form of oil and gas leases, except that it embraced two additional provisions, hereinafter adverted to. Cancellation of the lease was sought upon the ground that the lessor was induced to execute the contract through certain false and fraudulent representations made to him by an agent of the lessee and its incorporators. Appellee also sought in his pleadings to cancel the lease on the ground of abandonment, but there was no evidence of abandonment, and appellee does not urge that ground in his brief. There was a general jury verdict in favor of the lessor against the lessee and its incorporators, and judgment was rendered thereon canceling the lease and awarding

damages against all the defendants for $21,-000. The defendants have appealed, and present the case here in a brief of 242 pages, in which are propounded 82 propositions of law, which are predicated upon an even 100 assignments of error. This presentation is combated by appellee in a 154-page brief. The record consists of a transcript of 358 pages and a statement of facts covering 353 pages. Had the record been confined to material matters, it could easily have been encompassed within one-fourth of the space actually occupied, and the presentation could have been proportionately reduced. The real issues in the case are smothered in such an interminable mass of immaterial and irrelevant matter that it is extremely difficult to segregate the one from the other, imposing upon this court the necessity of several times carefully reading and re-reading the 353-page statement of facts. When this is done, however, the case becomes simple, and what appear at first blush to have been serious and difficult questions of law and fact dissolve into groundless complaints.

The lease contract sought to be canceled contained, among other usual provisions, the following stipulations:

' (1) The lease is to run for a period of five years, and as long thereafter as oil or gas is produced in paying quantities from the leased premises.

(2) The lessee is to use all reasonable efforts known to or practiced by competent oil producers to commence a well on the land within six months.

(3) If no well be commenced on the land on or before February 24, 1920, the lease shall terminate as to both parties, unless the lessee shall pay a rental of $3,321.25 within that period, which payment shall operate to postpone for three months the obligation to drill. And the payment of a like sum at the end of each three months may be made in lieu of drilling. Provision is made for operations in event the first well should be a dry hole, but this condition does not arise in the case.

(4) "If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to the heirs," etc., of the respective parties.

It appears that the relation of lessor and lessee between the parties originated in a lease contract executed by appellee to one Bailey, as trustee, on February 24, 1919, embracing the above-quoted provisions. On the same day a contract in the same form, but with appellant corporation named as lessee in lieu of Bailey, trustee, was prepared, but it was not executed, acknowledged, or delivered until about April 1, when it was substituted for the original lease. Subsequently, on May 22, both these contracts were substituted and confirmed by a new lease, which embraced not only all the provisions of the two prior instruments, but contained an additional stipulation described by the parties as a "guaranty clause," which was inserted in the language and at the instance of appellee, as follows:

"But it is expressly stipulated and understood that the lessee herein guarantees on the part of its assigns the full and faithful compliance of all the covenants and obligations imposed on the original lessee herein."

We quote from appellee's brief the following statement of his contentions in this appeal:

"First. That the procurers of the lease were all experienced oil developers whose success was attested by the fact that they had sold out their oil holdings in Oklahoma for $34,000,000 and were abundantly able financially to hazard large sums of money in exploring for oil and gas on the land.

"Second. That they intended in good faith to apply their resources to good-faith development of the land for oil and gas.

"Third. That they were owners of a corporation through which they intended to provide the money and in good faith to develop for oil and gas.

"Fourth. That they did not intend to assign any leases under the clause which gave the right to assign in whole or in part to any person or corporation who did not intend in good faith to mine and operate for oil and gas on said land, nor who was not financially able so to do.

"Fifth. That they intended to observe the obligation imposed by the lease to use all reasonable efforts known to or practiced by competent oil producers to commence a well on the land within six months.

"Sixth. That they intended to observe the clause by which they 'guarantee on the part of its assigns (plural) the full and faithful performance of all the covenants and obligations imposed upon the original lessee,' and that the parties understood and agreed that such clause extended to all assignees and imposed the obligation upon each to develop in good faith as the lease imposed upon the lessee. * * *"

Appellee further pleaded:

"Seventh. That the corporation was utterly insolvent and was wholly incapable of drilling; that it did not have and had never had any tools or equipment with which to drill; that as soon as lease peddling became unprofitable it had definitely abandoned further drilling, and that its officers had taken all the money on hand, which was proceeds from lease sales; that thereafter the last 800 feet was drilled by one of the appellants after he had been notified that the representations upon which the lease had been procured were being investigated and if found to be false it would be attacked.

"Eighth. That the corporation had become defunct, and that it was wholly disabled from proceeding further in discharge of its obligations under the contract."

The evidence upon the stated issues of fraudulent representations, alleged to have been made by appellants' agent and to have deceived appellee into making the contract, is uncontradicted, and therefore the decision

hereof becomes one of law as applied to undisputed facts. The negotiations leading up to the execution of the original and substituted contracts were conducted by one L. M. Lane in behalf of his associates and himself, who afterwards organized the lessee corporation, and by appellee, Urbahn, and M. T. Cogley in behalf of the lessor. Lane did not testify upon the first trial and died prior to the subsequent trials. The result is that the only testimony introduced for the purpose of establishing Lane's representations and their falsity was that of appellee and his agent, Cogley. Both of these witnesses testified at great length upon each of the three trials. Both of them are shown by the record to be successful men of large affairs, of varied and extensive business experience. It was shown, too, that appellee was extensively educated, both at home and abroad, and had been an "extensive reader." These facts are adverted to as being pertinent to appellee's contention that Lane had overreached and deceived appellee. Appellee and Cogley conducted the negotiations culminating in the execution of the several lease agreements. They alone testified as to the nature and extent of the representations and promises made to them by Lane. Their testimony was very full, direct, and fair, and, as a rule, but not upon every issue, consistent. Consistency, however, would be difficult to maintain through such interminable, sinuous, and oft-repeated examinations to which they submitted through a course of five years. But, it should be added, their testimony does not support the material contentions made in appellee's pleadings and brief. These contentions, which have been quoted from appellee's brief, will be considered separately and in the order of our own selection:

First: Appellee's second and third contentions, which, being closely related, will be considered together, are that Lane falsely represented that the procurers of the lease (second) "intended in good faith to apply their resources to good-faith development of the land for oil and gas," and (third) "that they were the owners of a corporation through which they intended to provide the money and in good faith to develop for oil and gas."

[1, 2] The false representation or promise, as applied to this case, that the lessees intended in good faith to develop the land for oil and gas, is too general in its character to constitute actionable fraud. A false representation or promise, in order to constitute a ground for cancellation, must be specific and definite in its scope and effect. It must assert a particular fact, or promise a specific accomplishment, and the complaining party must clearly show that he believed and relied and acted upon the existence of the particular fact, or upon the performance of the specific promise. Here, the declaration of an intention to "develop the land for oil and gas"

amounted to a general promise to perform a comprehensive contract embracing many definite undertakings, and was too general to constitute actionable fraud.

[3] The complaint of appellee is untenable for another, but related, reason: The good faith and intention of each party to perform the obligations of a contract is always presumed, as matters of course and of law; and the prior parol representations and promises of the parties that they intend in good faith to perform the obligations imposed upon them in a written agreement add nothing to the duties or liabilities resting upon them by presumption. So, in this case, the contention of appellee that he was induced to execute the contract on account of his reliance upon the alleged representation or promise of good-faith intentions to develop the land for oil and gas adds nothing to appellee's case, since the written contract about which the promise was made fully and expressly provided for such development, and the lessee's bona fide intention to comply with those provisions would be presumed, regardless of parol promises to the same effect. That would be true in any case, for no normal person would enter into a contract with another unless he believed the latter intended in good faith to perform the obligations imposed upon him in the instrument. Whether it is expressed or not, the law writes the provision of good faith into every contract that is made, and it is absurd to say that appellee would not have entered into this contract but for appellant's parol confirmation of such promises. Appellee did not testify that but for this parol promise of good-faith intention he would not have executed the contract. He did testify, in answer to questions designed to elicit such responses, that, "if he had known," or if Lane "had told him," that the lessee did not intend in good faith to develop the land, or had not intended to perform numerous other obligations specified in a long series of similar questions, he would not have executed the contract. That is true as a matter of course. That is true of every contract. But that is quite beside the question here.

[4, 5] While it is unnecessary to determine, and we do not decide, that the lessee fully or even substantially complied with the obligation to develop, or that appellee is estopped by his conduct from questioning the fact of compliance, yet we do find from the undisputed evidence that the efforts in the lessee's behalf approached so nearly to substantial performance as to defeat the charge that the lessee had no intention to develop. The representation of a good-faith intention to develop, was but a promise to develop in good faith. In order to establish actionable fraud in such case, it is necessary to show that at the time the promise was made there was not only a present intention not to develop, but a subsequent total, or at least substan-

tial, failure to do so. Here, whether or not the intention to develop was actually present when the representation or promise was made, the record shows conclusively that the lessee promptly went upon the leased premises and proceeded under great difficulties and at a heavy expense to drill the first well to a very substantial depth, and was so engaged until stopped by threats of this suit and its subsequent filing. The lessee having promptly and actually commenced development, and having prosecuted that development with substantial endeavor and progress until stopped by this litigation, the charge that he never had any intention of development falls.

[6] Second: The allegation ·embraced in appellee's third contention of fraud, that the procurers of the lease represented that they were the owners of a corporation through which they intended to provide money for the development of the leased premises, has no support in the evidence; on the other hand, it is directly refuted by the testimony of both appellee and Cogley. All the representations which appellee testified he relied upon related to the individual promoters of the corporation, which had not then been organized; none of them related to the corporation. No statement is claimed to have been made as to the amount of the capital stock, or the value of the assets, of the proposed corporation, or as to its resources except as represented by the responsibility of the proposed organizers. Appellee repeatedly testified that there was no representation or understanding as to whether the promoters were to operate through a corporation, or association, or trustee. "It was immaterial to me," he testified, "in what form they intended to operate, whether under a trustee, as was largely done in the oil business, or a corporation." So no such representation as that charged in the pleading was made, but, had it been made, its truth was confirmed by the acts of the promoters, who supplied their individual funds with which the operations of the lessee corporation were carried on.

[7] Under this allegation, appellee further contends that the procurers of the lease represented at the time the original lease was executed that appellant corporation was already organized and chartered, when in fact no such corporation was then in existence; and appellee contends in his pleadings and brief that he relied upon this representation, and was thereby deceived into executing the lease, whereas, he would not have done so but for such representation and his reliance thereon. But here, again, the charge of fraud contained in appellee's pleadings and brief is conclusively refuted by the testimony of appellee and Cogley. We held in a former appeal of the case that this representation, even if false, was not of such materiality in this case as to warrant cancellation. 265 S.

289 S.W.—12

W. 1063. We adhere to that holding. A careful study of the record in this appeal forces the conclusion that when the Bailey (trustee) lease was executed, both appellee and his agent, Cogley, knew and understood that the corporation had not been organized; that the promoters represented by Lane intended thereafter to organize and take over the lease; and it appears that it was for this. reason and with this understanding between the parties that the lease was taken in the name of the trustee, Bailey, who became the president of the corporation when it was organized a few days later, and nearly a month before the first lease was taken in the name of the corporation in substitution of the lease to the trustee. Cogley, being reminded upon the last trial that the original lease to the trustee, and the first lease to the corporation, bore the same date, February 24, testified that—

"Those two papers, the one to Bailey, trustee, and the one to the Rio Grande Oil & Gas Company, both of which are dated February 24, were not signed about the same time—there was quite a time afterwards that he brought the second paper for signature of Mr. Urbahn."

And:

"It was generally understood at the time the Bailey (trustee) lease was taken that there would be a corporation or association organized to take over and operate it—take over the lease and operate for oil and gas under it."

Upon the last trial appellee confirmed his testimony upon the second trial that—

"The first lease was to a trustee until they could get a company organized. * * * They came back with a contract in the name of the Rio Grande Oil & Gas Company as a substitute for this Bailey (trustee) contract. I did not know what sort of a company was to be organized. I left that for him (Lane) to determine. But it was understood that a company or association, whatever it might be, was to be organized. I did not ask him."

Upon the first trial appellee testified that—

"As I understand it, the first lease was to a trustee until they could get the company organized. It was organized and gave them a name."

So, while it is true that the corporation was not in being when the original lease was executed to Bailey, it is obvious from their testimony here set out that appellee and Cogley were aware of the fact. The first contract between appellee and the corporation is shown to have been executed and acknowledged on April 1, after the corporation had been organized on March 5. The testimony of the two witnesses may be somewhat confusing upon this issue, which is in truth immaterial in view of the facts of the whole case, and it may be that some of their testimony may be construed as in conflict with their testimony set out above, but their other testimony will not be construed so strongly

in their favor as to bring it into direct conflict with their positive and plain testimony which we have quoted, especially since the latter is supported by the obvious history and circumstances of the transaction. The allegation under consideration is clearly refuted by the record.

[8] Third: The lease contract contained a stipulation that—

"Lessee and his assigns agree to use all reasonable efforts known to or practiced by competent oil producers to commence a well on the land herein within six months from the date hereof" (May 22, 1919).

In his fifth contention appellee asserts that the procurers of the lease falsely represented to appellee that "they intended to observe the obligation imposed by" the foregoing stipulation. And appellee seeks to cancel the lease because of said false representation, contending that by it he was deceived into making the contract. The contention is obviously without merit, first, for the reasons given at length in the first numbered paragraph of this opinion concerning Lane's promise in behalf of his associates and himself to perform the conditions of the contract. The intention to perform this obligation and all other obligations of the contract was implied, and the expression of that implied intention added nothing to the lessee's duties and obligations, or to appellee's remedies. Be that as it may, however, if it is true that appellants did not commence a well within six months, they made considerable progress, and expended a considerable amount of effort and money to that end within that time; enough at least to refute a charge of bad faith, or of no intention. Appellee knew of the progress appellants were making, of the efforts and money they were expending, the difficulties they were encountering, and the causes of the alleged delays. He not only made no complaint at the time, nor does he yet in his evidence, but frankly testified that under the known facts the delay was reasonable. And, still without complaining, and with knowledge of the facts, he permitted appellants ultimately to spud in the well, and drill it to a depth of over 1,600 feet, at an expense in excess of $50,000. Of course, it is true, then, as a matter of law, that he waived any right of action he may have ever had on account of the alleged parol misrepresentation, or the provision in the contract declaratory of that representation. He is absolutely estopped to now complain of a breach of that provision, or of the parol confirmation of it.

[9] Fourth: In his first contention, as stated in his brief, appellee alleged that Lane represented:

"That the procurers of the lease were all experienced oil developers whose success was attested by the fact that they had sold out their oil holdings in Oklahoma for $34,000,000 and

were abundantly able financially to hazard large sums of money in exploring for oil and gas on the land."

The evidence supports the allegations that Lane made substantially these representations to appellee, and that the latter would not have executed the original lease but for such representations. In subsequently organizing the corporation Lane was joined by Gruver, Bailey, and Crow. Lane mentioned neither of these associates in making the representations complained of. He mentioned by name only a Mr. McFarland, and although there is evidence in the record that the latter had theretofore sold out his oil holdings for $34,000,000, and to that extent that specific representation was true, yet McFarland never became interested in the project. It may be said therefore, for the purpose of this inquiry, that Lane's representation that he was "backed by parties * * * who had sold out their holdings in Oklahoma for over $34,000,000," which is the precise language of the representation as recalled by Cogley, was false. But the remaining elements of the representation were shown to be substantially true. It was shown that both Bailey and Gruver were largely interested and experienced in practical oil operations. The trial court found in a former trial of this case, upon a state of facts less impressive than those presented in this appeal, that the principal promoters and incorporators of appellant corporation, Bailey, Gruver, and Crow, were worth $425,000, and we held in a former appeal that such responsibility rendered them fully able financially to perform the obligations of the lessee in the contract here sought to be canceled. We adhere to that holding, which is now fortified by a stronger state of facts than appeared in the former appeals. Under no phase of the case presented here, under no express or implied provision of the contract, could the lessee or his assigns be required to drill more than one well at a time on the leased premises, at least unless and until there was production on this or adjacent premises making offset wells necessary to protect these premises against drainage by others. If the first well should prove to be a paying producer the proceeds therefrom would insure further development; if it should prove a dry hole the lessee would be privileged to exercise his judgment as to further operations, and could abandon the lease at that juncture if he so elected. Even if the first well should cost the lessee $100,000, as estimated by appellants at the time they began operations, the promoters referred to were shown to have ample means with which to drill it and three others at like expense. Appellee's contention, as made in his brief, is that wells could be drilled on the leased premises at an expense of from $7,500 to $8,500 each. This contention is based upon obviously incompetent testimony, but, if it were true, then ap-

pellants were and are financially able to drill 50 wells upon the lease. Be that as it may, however, the real test of the truth of the representation is, Were the promoters possessed of sufficient means to develop the leased premises in accordance with the terms of the contract finally entered into by the parties? The record shows they were possessed of ample means for that purpose. It shows that they at once began to expend those means in the operations upon the lease, and continued to expend them without stint until stopped by this litigation. If, as appellee now contends, the operations have been unreasonably delayed, those delays were not occasioned by shortage of funds, and appellee does not so claim. It is not contended, and cannot rationally be contended that Lane's statement that he was backed by men who had recently sold out for $34,000,000, when taken alone, enticed appellee into leasing his ranch; what appellee wanted to be assured of, what he relied and acted upon, was that the promoters were amply able, financially, to perform the obligations imposed upon the lessee by the contract, and he so testified. So tested, the representation was shown to be true and there was no actionable fraud.

[10] Fifth: Appellee contends in the fourth complaint set out in his brief that Lane represented that the procurers of the lease—

"did not intend to assign any leases under the clause which gave the right to assign in whole or in part to any person or corporation who did not intend in good faith to mine and operate for oil and gas on said land, nor who was not financially able to do so."

The evidence shows that before the original lease was executed Lane represented to appellee that his principals were financially able to develop the leased premises with their own resources; that they were not under the necessity of "peddling" leases in order to develop, and would not do so. However, when the original lease contract was executed it contained a stipulation allowing to both parties the unrestricted privilege of assigning their respective estates "in whole or in part." This clause was deliberately incorporated into the agreement, and no fraud, accident, or mistake is sought to be imputed to it. Appellee was aware of its full import and effect. Under that provision the lessee was plainly given the unrestricted privilege of assigning the lease, either in its entirety or in as many parts as he chose to divide it, and to whomsoever he chose.

[11] The parol statement of Lane may properly be resolved into an oral promise or agreement that the lessee would not "peddle" leases to persons unable, or having no intention, to perform the obligations imposed upon the original lessee by the contract in event of the default of the original lessee. So long as the original lessee of an oil and gas lease performs the obligations imposed upon him in the contract, such performance inures to the benefit of his assigns to whom parts of the lease may be sold. The assignee of part of a lease is not required to become the actor, until his assignor defaults. So, in any event, within the contemplation of the parties in this transaction the test of the ability and intention of appellants' assigns depended upon the contingency of the lessee's ultimate default in his obligations, and the reaction of the assignees to that event. The ability and intention of the assignees could not properly be determined until they were confronted with the duty to perform.

[12] It follows, then, that Lane's promise or agreement or representation that his principals would not so freely exercise the unrestricted right of assignment given them in the contract as to assign the lease or parts of it to those who were financially unable or had no intention of developing the lease was so remote and speculative as to deprive it of the force of a material representation. Of course, had appellants assigned the entire lease to an irresponsible, a different question might arise, but does not in this case, since appellants have not only not assigned the whole lease, nor as much as one-eighth of it, but they retain most of it, and are insisting upon their right to hold their contract and continue development thereunder. However, if the representation was material and would support an action for fraud, it fails to serve in this case for the one reason, even if there are no others, that there is no evidence in the record that any of appellants' assigns, to whom 7,000 acres of the 53,000 under the lease have been assigned, are financially unable, or do not intend to develop the lease in event it becomes their duty to do so.

[13] We conclude, further, that this complaint of appellee is untenable for another reason: The subject-matter of the alleged oral fraudulent promise or agreement was made the subject of an express provision of the contract subsequently entered into by the parties, whereby the privilege of assignment was allowed the parties without restriction; whereas, in the prior parol agreement that privilege was sought to be limited by the vague restriction against "peddling" leases to irresponsibles. We are of the opinion that the parol agreement and promises with reference to assignment must be held to have been merged into the final agreement upon that subject as expressed in the written contract, which is too plain to permit of modification on account of prior parol understandings or representations.

[14] Appellee knew when he executed the original lease to the trustee, on February 24, that it contained the stipulation allowing the lessee the unrestricted privilege of assignment; he knew the same stipulation was carried into the substitute lease to the corporation a few weeks later, on April 1, and we

are of the opinion that by this course he waived his right to complain of the representations made by Lane that the lessee would not claim or exercise that privilege in full. The presence of the unrestricted assignment clause "stared him in the face all the time," and "annoyed him," according to his own testimony. It was in his mind when he was requested to sign the final contract on May 22; he was afraid that appellants, upon whose responsibility he relied, might exercise the privilege and by assigning to irresponsible persons evade their direct responsibility to develop the land. In this situation he refused to execute the final contract in the form of the two previously executed, or until he was protected against the possibility of appellants evading their responsibility to develop by assigning to irresponsibles. He did not expect or wish to cut off the right to assign; he desired appellants to retain that right, and so testified repeatedly. So he refused to execute the final contract until the following additional clause, couched in his own language without suggestion from appellants, and described by all the parties throughout the record as the "guaranty clause":

"But it is expressly stipulated and understood that the lessee herein guarantees on the part of its assigns the full and faithful compliance of all the covenants and obligations imposed on the original lessee herein."

[15] With this additional clause inserted the final lease contract was executed and delivered and is now sought to be set aside. The effect of the record is, then, that even if the parol agreement or promise not to assign the lease or parts of its promiscuously to irresponsibles was not merged into and superseded by the incorporation into the lease of the provision allowing unrestricted assignment, and even if the right to complain of the alleged deceit was not thereby waived; even if the subsequent execution of the second instrument granting the same unrestricted right of assignment did not have that effect, then certainly that effect was accomplished by appellee's voluntary execution and delivery of the new and confirmatory contract, embracing the additional provision by which appellee in language of his own selection stipulated and enforced protection against injury to himself from the very acts of which he now complains. By confirming the previous contract and enlarging it with the provision protecting himself against injury from the operation of the unrestricted assignment clause, appellee undoubtedly recognized and affirmed the validity of that clause.

[16] Sixth: Appellee in his sixth contention asserts that the "guaranty clause," set out above, was intended and understood by the parties to provide:

"That such clause extended to all assignees and imposed the obligation upon each to devel-

op in good faith as the lease imposed upon the lessee."

But the record does not support this contention. The clause is couched in plain and unmistakable language, of appellee's own selection, and, as appellee testified, "It is self-explanatory." Appellee alleged in his pleadings that it was intended by this clause to "impose upon the (lessees) the obligation not to assign and peddle leases promiscuously to lease speculators and to persons not intending in good faith to develop said land and not financially able to do so." But nothing in the language of the provision can be given such import, nor did it purport to operate directly upon the assignees of the lease, or enlarge or emphasize their obligations, as contended in appellee's sixth ground of complaint as quoted above. The clause means, and appellee intended it to provide, simply that, in event of the assignment of the lease by the lessee, the latter guaranteed that its assigns would perform the obligation to develop in accordance with the terms of the lease. Appellee and Cogley both so testified, and, while their testimony upon this point is confusing and inconsistent, none of their other testimony is so direct or positive as to overcome the effect of parts of their testimony now to be set out.

In the first trial appellee explained the object of the clause in this way:

"This article of the contract which followed the usual form, I believe of what they call the Texas contract, 'If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns,' but that does not state that the grantee in this lease would be responsible for the companies to which they were transferred, and knowing that the oil business was not only full of ups and downs, but of people who were up to all sorts of manipulation, I thought it would be better to protect myself by adding this (guaranty clause) believing that these grantees were the millionaires that Lane asserted were behind them, and therefore fully capable of guaranteeing their assigns."

In the second trial Cogley testified with reference to the guaranty clause:

"Mr. Urbahn made it a point * * * that, if Lane asked for a right to assign, it might be to their interest to do it, and I submitted it to Mr. Urbahn, and he made the point that they might assign and release themselves from the obligation to develop, and it was agreed that, if they assumed this obligation to develop, there would be no objection to making an assignment of the lease."

And upon the last trial he said:

"Mr. Urbahn, of course, gave me instructions in regard to having this particular clause put in there, and in wording it I had in mind his protection against the peddling of leases to people who had no intention of developing the

land. The protection I intended to give was not that, if they did assign to people that were not responsible, by the terms of that they had to guarantee performance by those people. They were not supposed to sell to anybody that was not responsible, so Mr. Urbahn would have to force them to do it, and the clause was put in there that they would guarantee the performance. That they would guarantee the performance, that is what the clause says. As a banker, I understood that they would perform, *if the parties to whom they sold would not perform;* that they could be held; and that was the idea that I intended to convey by that clause."

[17] It should be added, as an additional controlling defense of this contention of appellee, that no matter what construction may be placed upon the guaranty clause, it was placed in the contract solely upon appellee's insistence and in his own language, and its breach by the lessee would in no event warrant cancellation at the instance of appellee.

[18] Seventh: Appellee complains at great length that appellant corporation was insolvent and incapable of drilling, and owns no tools or equipment for drilling; that its officers have taken all its money; that it keeps no books or accounts or minutes of its proceedings, and is now defunct; its charter having been forfeited by the state of its domicile, Oklahoma. These facts are urged, presumably, as grounds for forfeiting the lease in controversy.

[19] The evidence shows that the corporation is capitalized at $200,000; one-half of its capital stock having been issued in equal amounts to Lane, Gruver, Bailey, and Crow, who constitute its only stockholders. These stockholders, except Lane, who is dead, are shown to be men of large affairs; they have long been business associates. They went into this project as a joint venture, and apparently with no definite agreement as to their respective obligations, duties, or liabilities. They separately at times assumed substantial personal obligations and expended their individual efforts and resources in behalf of the corporation, as lessee. At their own expense they made frequent trips from their homes in Oklahoma, and one of them in Pennsylvania, to this lease in Webb county, Tex.; one of them advanced $10,000 out of his personal funds to promptly start development of the lease; another shipped his own string of tools and other equipment and used them in the drilling operations; two of them used their own funds in voluntarily taking up dishonored checks, amounting to $2,000, given by Lane; one purchased $5,000 worth of motor trucks for use in operating the lease; another, during the last four months prior to the institution of this suit in May, 1921, drilled the last 800 feet in the well at his personal expense of $10,000. These advancements were made freely and voluntarily by these men, without security or demand for accounting or reimbursement from their associates or the corporation. The advancements were made for and in behalf of the corporation, in performing its obligations under the lease contract here sought to be canceled. All these men apparently were at all times and are yet ready, willing, and able to continue the operations called for in the lease, and have vigorously defended against this suit since its institution by appellee, more than five years ago. In this state of facts we do not understand that appellee is in a position to complain of the lax conduct of the corporation as such, or to demand a cancellation of the lease because of that laxness. So long as the officers of the corporation are supplying the funds and performing the obligations required of the lessee by the terms of the contract the lessor cannot complain of the loose manner in which the corporation conducts its internal affairs, or keeps its books and minutes, or of the emptiness of its treasury, or of its failure to comply with the laws of the state of its creation. If the corporation has not complied with the laws of the state of Oklahoma, the right to complain thereat lies in the government of that state, acting through its proper officers, and appellee may not complain, at least until he has suffered injury on account of the particular unlawful acts. And that is not shown here. Certainly those acts do not warrant the cancellation of this lease contract.

[20] The acts done by the incorporators in performing the obligations of the lessee corporation under the contract were done in behalf of the corporation, and therefore inure to its benefit. Whether these acts measure fully up to the strict requirements of the contract is not a controlling subject of inquiry in this suit, which is for cancellation of the lease contract on account of its fraudulent procurement from appellee.

[21] Ninth: The fact that since the institution of this suit appellant corporation has become defunct and its charter forfeited under the laws of the state of Oklahoma does not warrant cancellation of this lease contract or abatement of the right of defense, as contended by appellee in his eighth ground of complaint, for the same laws not only provide for reinstatement of appellant's charter in event of its forfeiture, but also provide for the continuation and defense of the suit to final judgment after forfeiture.

We have considered and discussed each of the grounds upon which appellee in his pleadings sought cancellation of the contract, as those grounds are set out in appellee's brief. We have gone into tedious detail in the discussion in deference to the able and earnest presentation in appellee's brief, and because the case has been tried and appealed three times at large expense to the courts and the parties, and should be terminated in view of the complete presentation of all the

facts of which the case appears to be susceptible.

We hold that appellee has shown no actionable fraud upon the part of appellants in procuring appellee to execute the contract in controversy. That is the only ground upon which that contract is now sought to be canceled, and the only purpose of the suit, and, as the case has been fully developed in all its phases, it is ordered that the judgment of the trial court be reversed, and that judgment be here rendered that appellee take nothing of appellants by reason of this suit. Appellants will be allowed 90 days from the day on which this judgment becomes final in which to resume active operations under the terms of the lease.

Reversed and rendered.

FLY, C. J. I concur in the foregoing opinion.

COBBS, J. (dissenting). Finding myself unable to concur with the majority of the court in the disposition of this cause, I file my individual views of what disposition should be made thereof and my reasons therefor—writing the opinion I think should have been written in this case.

Appellee brought this suit against appellants to cancel an oil and gas lease to 53,000 acres of land in Webb county, upon the alleged ground of fraud and fraudulent misrepresentations to appellee, upon which false representations he relied and which influenced the lessor to make the lease, and upon the further ground of the breach of the contract upon the nonperformance on the part of appellants, by failing to comply with the express terms of the agreement, which in law likewise amounted to an abandonment of the contract that justified the cancellation of the lease and gave appellee the right to recover the possession of the land, together with damages.

Appellants' pleading was sufficiently responsive and the trial proceeded with a jury, who, after being charged by the court, returned their verdict in favor of appellee, and the court entered judgment thereupon, in part, as follows:

"It is by the court further considered, ordered, and adjudged that the title of the plaintiff, Albert Urbahn, in and to the above-described land, be and the same is hereby declared freed from any claim or interest depending upon or arising out of either said lease above described, dated February 24, 1919, or the confirmation thereof above described, dated May 22, 1919, and the assignment from the defendant Rio Grande Oil & Gas Company to the defendant Clara E. Lane, dated February 24, 1920, assigning portions of the lease to said land then claimed by the defendant, Rio Grande Oil & Gas Company.

"It is by the court further considered, ordered, and adjudged that the plaintiff, Albert Urbahn, should have and he is hereby awarded his judgment, jointly and severally, against each of the defendants Rio Grande Oil & Gas Company and I. F. Crow and S. E. Baily and J. M. Gruver for the sum of twenty-one thousand five hundred seventy and no/100 ($21,-570.00) dollars, together with interest thereon from this date until paid at the rate of 6 per cent. (6%) per annum, for which plaintiff may have his execution.

"It is by the court further considered, ordered, and adjudged that the plaintiff be and he is hereby denied any judgment for damages against the defendant Clara E. Lane.

"It is by the court further considered, ordered, and adjudged that plaintiff should be and he is hereby awarded judgment against defendants Rio Grande Oil & Gas Company and I. F. Crow and S. E. Baily and J. M. Gruver for all costs in this behalf incurred, for which let execution issue."

The court gave a general charge without submitting it, as it is now very generally done, upon special issues.

This is one of the largest records that has come before this court, having such few real questions of law in it. It is a fact case largely. The transcript contains 255 pages. The statement of facts contains 352 pages. Appellants' brief contains 242 pages, and includes therein 100 assignments of error, 82 points, and citation of 120 decisions. The appellee's brief contains 154 pages and he answers and argues every proposition of appellants and cites 15 authorities.

This is the third appeal of this case. The suit was first tried by the district court of Webb county, who found for appellee. That judgment was reversed by this court and the case was remanded to the district court for another trial. See Lane v. Urbahn, 246 S. W. 1071. It was again tried, but this time with a jury. See 265 S. W. 1063. And on appeal it was again reversed and remanded for another trial, and in its opinion this court said:

"This cause has been tried and disposed of in the court below largely in disregard of the opinion of this court on a former appeal; the questions now presented being practically the same as those raised and disposed of in the former appeal. 246 S. W. 1070. There is no occasion to restate the facts in detail, nor discuss those questions at length."

This case presents an example of where appellate courts should affirm judgments when possible to do so when substantial justice requires it. One trial judge, a very able and learned one, too, and 24 jurors, have severally passed on the facts, and they are not greatly different, except that on this trial they are much more favorable to appellee.

There is another well fixed and established rule that appellate courts will not, should not, and ought not to interfere with the findings of the jury if there are any material facts to support such findings. Heard v. Pratt (Tex. Civ. App.) 257 S. W. 662, and Texas Pipe Line Co. v. Huddleston (Tex. Civ. App.) 274 S. W. 168. In the first-cited case the opinion was written by the writer of this one, and in the

other by the associate justice who wrote the two opinions in the case of Lane et al. v. Urbahn, supra. Hence in the disposition of this case we will be governed by the rules stated. It is quite likely if this case were reversed and remanded it would again be returned here with the same result.

We have given this record a most thorough examination. Though. lengthy, we have examined carefully the statement of facts and read and considered the brief of each party. That being the case, and on account of the former trials and opinions of this court just read, we are going to dispose of this case without quoting too much at length from the pleading and testimony, but sufficiently so and by referring the reader to the opinions of the court in the former appeals of this case for an understanding of the true issues involved.

Let us set out certain established rules fixed for guidance in respect to cancellation of oil leases. We have heretofore held in such cases, though forfeitures are not (generally) favored in law yet in oil leases forfeitures are favorably considered. The law does not favor holding up indefinitely from developement oil leases of large tracts of land, but rather favors speedy cancellation for want of development. This rule is further enlarged so that in the construction of oil and gas leases that construction most favorable to the lessor should be given. Emery v. League, 31 Tex. Civ. App. 474, 72 S. W. 603; Aycock v. Reliance Oil Co. (Tex. Civ. App.) 210 S. W. 848; 18 Ruling Case Law (Mines) § 115, p. 1214.

The lease expressly grants the right to assign in whole or in part. The contention is that the lease was procured for development purposes; a clause was written into the lease imposing a drilling obligation. The contention of appellee is that it was affirmatively represented to him to execute the lease that the assignment clause was not to be used except to people who intended in good faith, to develop, and, for that reason and understanding to satisfy appellee, appellant made the agreement. The effect of this was to be construed as a representation that not only one but each of the assignees was bound by and would discharge all obligations imposed upon the lessee for the benefit of appellee, one of which was to develop.

There is another well-established rule pertinent here that fraud vitiates all contracts, and though fraud, like any other fact, must be proven, there are many things of apparent minor importance, which, if in any collateral way tend to throw any light on the transaction to establish the fraud, may be used as circumstances, when relevant, to aid the jury in passing upon the main question.

As material facts to cancel the lease for fraud it was alleged that the following misrepresentations were made by appellant:

"First. That the procurers of the lease were all experienced oil developers whose success was attested by the fact that they had sold out their oil holdings in Oklahoma for $34,000,000 and were abundantly able financially to hazard large sums of money in exploring for oil and gas on the land.

"Second. That, they intended in good faith to apply their resources to good-faith development of the land for oil and gas.

"Third. That they were owners of a corporation through which they intended to provide the money and in good faith to develop for oil and gas.

"Fourth. That they did not intend to assign any leases under the clause which gave the right to assign in whole or in part to any person or corporation who did not intend in good faith to mine and operate for oil and gas on said lease nor who was not financially able so to do.

"Fifth. That they intended to observe the obligation imposed by the lease to use all reasonable efforts known to or practiced by competent oil producers to commence a well on the land within six months.

"Sixth. That they intended to observe the clause by which they, 'guarantee on the part of its assigns the full and faithful performance of all the covenants and obligations imposed upon the original lessee,' and that the parties understood and agreed that such clause extended to all assignees and imposed the obligation upon each to develop in good faith as the lease imposed upon the lessee."

Thomson, an experienced oil man, testified in response to a hypothetical question based on testimony given by Gruver, that in all his life he had never known good-faith drilling to be done in the fashion outlined by Gruver. A well to a depth of 1,600 feet should have been drilled within three or four months, based on his knowledge and experience of good-faith drilling. Tools, which Gruver testified occasioned weeks of delay, could have been procured out of San Antonio within three days. That he had procured such tools for drilling at that time in Somerset from San Antonio. The reasonable cost for drilling such a well 1,600 feet and fitting it for pumping was from $7,500 to $8,500. There should have been more casing on the ground at that time, but the well should have been finished long before. That cable tools were not necessary, that practically all the oil fields in Texas were developed with rotary rigs.

Jeffries testified at this trial that since this lawsuit began a well in the same creek has been drilled about eight or nine miles further up, in the same character of soil, which at first caved in considerably the first 300 or 400 feet, which was actually drilled over 2,500 feet from the 1st day of June until the 1st day of September, having been shut down 14 days.

Appellee offered no evidence at any former trial with reference to the unusual formation, on the question of the slow progress of the well, in answer to appellants' contention.

Baily testified for the first time on this trial in denial of Crow's testimony that the company paid $1,500 for labor in drilling. Crow and Gruver testified at former trials as to the various items spent in drilling this well, among which was $1,500 allowed Lane for payments to drillers. Baily denied this and affirmed he had a contract to drill this well and ·that he paid every cent of the labor bills himself.

At former trials it was claimed the company was drilling the well in 1921, when the second 800 feet was put down. Baily testified at this trial that he had a contract to drill the well, and Gruver agreed to do the drilling for Baily, and that to his knowledge the company never paid 5 cents for drilling expenses on the second 800 feet; that the company provided no money for drilling ·after January 1, 1921.

At former trials complaint was made that the company was embarrassed financially because Baily checked out some $24,000 or $25,000 in the latter part of 1920. At this trial Baily testified he had authority to check this out; that the amount of the check was $20,500; that he and his brother were drilling the well by contract and they drew this check because they had never drawn any money on their contract. On this trial Crow modified his testimony and admitted that Baily had the right, but did not think Baily should have arbitrarily fixed the amount due ·him.

At former trials it was contended that Baily refused to come down and testify. This Baily denied, and said he told them always that he was ready to come. Baily testified on this trial, never testified to before, and produced a telegram to bear it out, which Crow testified he wrote in May, 1921, that the assignment of the unsold portion of the lease to Lane's wife was a forgery.

The testimony shows that the acknowledgment of Baily was taken before Dene Taylor and that she is now in Tulsa, but neither Crow nor Baily ever asked her about having made what Baily testified and what Crow wired to be a forged acknowledgment.

It was proven at this trial for the first time that the appellant corporation had its charter forfeited in 1923; that the statutes of Oklahoma, under which the corporation was organized, require the keeper of books to show its business transactions. The evidence here shows that the only book or record which can or will be produced is a loose-leaf minute book; that at the time the guaranty clause was written the ones acting for the corporation had already drafted their form of lease assignment which imposed no obligation upon their lessees or assignees and had contracted with salesmen to conduct lease assignments. After that had been done the guaranty clause was written into the contract, showing, as appellee contends, that ·at the time the guaranty clause was written

there was no intention on the part of the corporation to respect the contract, and we find ourselves reaching the same conclusion. The minute book shows that the $10,000 note signed by the corporation and indorsed by the stockholders is not an obligation of the company at all, but was for money loaned for the payment of their stock; whereas, on all former trials Gruver testified that it was an obligation of the company on which suit was brought before appellee filed this suit. On this trial Gruver testified he had always thought that it was a loan of the company, but, having been shown the minute book, stated that he did not believe it to be an obligation of the corporation.

On this trial a subpœna duces tecum was issued for the original report of the Geologist, in response to which Crow testified he was unable to find. This testimony is largely taken from the statement of the evidence made in appellants' brief, pages 13–72, where the pages of the statement of facts refer to the testimony.

The procurers of the lease were found by the jury not to be experienced oil men, and did not have the resources which they represented they had to develop the 53,000 acres of land in good faith, and that they did not have the financial backing, but were securing the lease fraudulently, against appellee's insistence, to develop only one well as a basis to sell leases, or to "do a lease peddling business" to secure money by the sale of leases, rather than to bring wells in on the land that it might be developed as an oil-producing field. They asserted that they represented a strong financial corporation which they did not, but undertook to organize one so that they could exploit and sell stock or oil leases for their sole benefit. The corporation as organized was wholly insolvent; it owned no substantial assets by which the obligation to appellee could be carried out. After selling leases which became unprofitable they abandoned further drilling, and the officers took all the money on hand. It therefore became defunct and unable to proceed further. The corporation operated under an Oklahoma charter and it was forfeited by that state, leaving no assets or successor to carry out its obligations.

There cannot be any dispute that appellee was unwilling to lease the land unless the appellants would do so in good faith and were financially able to do so. A limitation was attempted ·to be placed on the sale of leases indiscriminately. Mr. Coyly testified that Mr. Lane said he was backed by parties who had sold their Oklahoma interest for $34,000,-000 and would develop the land and would not peddle leases to secure capital, for they did not have to do it, as they had sufficeint capital for that purpose.

Appellee testified:

"Mr. Lane said that they were not under the necessity of selling or peddling leases and

would not do so. My objection to the peddling of leases was that I had seen the effect of the peddling of leases. I told him that I would not lease to anybody that intended to peddle, and he said that they did not intend to do that. He impressed me favorably and I believed what he said. .

"I did .not care what the names of these successful oil developers were that were trying to get a lease on my land, because I wanted to be assured, and he (Lane) did assure me, that there was sufficient capital to develop the land without selling leases; that is, peddling leases. Mr. Gruver, nor ·Mr. Baily, nor Mr. Crow, ever discussed with me on any of their visits here before this suit was filed what their intentions were when they took the lease with reference to how they were going to get money to drill with if they drilled. They never had any discussion with me of that kind.

"I would not have leased to any one except with sufficient capital to develop the land. Before signing any lease whatever I had stated to him (Lane) that I would not sign any lease to anybody except those financially able to develop the property with their own resources and who would not sell leases or peddle leases to those who did not intend to develop and were not financially able to develop. I emphatically would not have signed any papers to Mr. ·Lane to place in his hands and go off and solicit promoters for a corporation to acquire my land out there."

The testimony is full and satisfactory to show that appellee leased the property to appellants in pursuance with the belief and upon the fraudulent representations made to him upon which he relied that the parties had sufficient capital to develop the land for oil and would do it and not peddle leases. Authority was given to assign leases, but the lease contract so assigned obligated "its assigns (to) the full and faithful compliance of all the covenants and obligations imposed on the original lessee herein." This assign-ment, therefore, by direct terms bound and obligated the appellants to specifically perform all the agreements of the assignees, whatever they were, either express or implied. They took the lease contract cum onere.

This is a fraud case and violates the rule established by the Legislature that protects parties against fraud. That law says:

"Actionable fraud in this state with regard to transactions in real estate * * * shall consist of either a false representation of a past or existing material fact, or existing promise to do some act in the future which is made as a material inducement to another party to enter into a contract and but for which promise said party would not have entered into said contract, provided however that whenever a promise thus made has not been complied with by the party making it within reasonable time, it shall be presumed that it was falsely and fraudulently made, and the burden shall be on the party making it to show that it was made in good faith but was prevented from complying therewith by the act of God, the public enemy or by some equitable reason." Article 3973a, Vernon's 1922 Statutes, Act 1919.

Appellants have not disproved the allegations of fraud nor satisfied "the presumption that it was falsely and fraudulently made." The verdict of the jury established their fraud.

Promises made without intention of fulfillment in order to induce a contract are as culpable and as harmful and as willful as misstatements of existing facts. The lessor had the right to contract that subleases of his land should not be peddled about and sold indiscriminately, and patched over with leases like a shingle roofed house. Subleasing is not favored by law. It cannot be done without the consent of the lessor. Article 5237, R. S. of 1925. Such proof does not vary the terms of a written contract, but is a consideration for the leasing, and such testimony is material to establish that a written contract, otherwise fair on its face, was procured by fraud, and voidable. Thompson v. Sawyers, 111 Tex. 374, 234 S. W. 874, 875; Collum v. Sanger, 98 Tex. 162, 82 S. W. 459, 83 S. W. 184.

The jury found there was fraud, and hence appellants' defense of estoppel was not sustained by the facts. All the stock of the Rio Grande Oil & Gas Company was issued to Baily, Gruver, Crow, and Lane, and they have each by their pleadings expressly disclaimed all "title to or interest in the land or lease or other matters in controversy in this suit, other than as a stockholder." They were the only stockholders and directors. Appellants themselves show that the corporation has had no money since January 1, 1921, and has not paid 5 cents for the drilling which was done subsequent to that date.

As aptly stated by appellee, which we approve:

"The evidence shows that the drilling was done by Gruver and he swears to have had no agreement with the corporation, nor with Crow or Baily. Crow and Baily swore that the drilling was done for the corporation because of an agreement between Baily and Gruver, to which Crow was not a party. It would be legally impossible for any such agreement to have been made in behalf of the corporation. Gruver was disqualified in acting as a director where he was contracting for himself, and that left only one director, Baily, to bind the corporation. That he could not do. No higher evidence could exist that this drilling was a personal matter of Gruver's, as he swore it was, than the fact that he has never been repaid one cent for this drilling, and they all swore that he has never presented any claim therefor. Upon Gruver's express pleadings he is claiming no rights except as a stockholder and he pleads no estoppel for his benefit individually.

"The testimony showed that the only asset the Rio Grande Oil & Gas Company has is this lawsuit; that it has no drilling tools or equipment, no money, and owes the appellant Gruver either $22,000 or $32,000 principal; and that the charter of the corporation was forfeited by the state of its creation on October 15, 1923.

"The only interest in the lease that the stockholders could have, if any, of a defunct corpora-

tion, was that of individual stockholders, but they disclaimed any interest. It would be an anomalous judgment which should award against appellee and to the Rio Grande Oil & Gas Company, which does not exist, and which left at its demise no asset with which to perform its obligations, a lease upon 53,000 acres of land, which, under its terms, could only be held by the continued drilling of an oil well."

The pleading was sufficient to let in proof under the guaranty clause in the lease that the obligation of performance on the part of the subsequent lessees to good-faith development was so intended and understood. That was such a covenant that ran with the land and sufficient to bind the subsequent lessees. If it was ambiguous it was subject to proof. Hitson v. Gilman (Tex. Civ. App.) 220 S. W. 144; Pierce v. Allen (Tex. Civ. App.) 278 S. W. 455; Aycock v. Reliance Oil Co. (Tex. Civ. App.) 210 S. W. 848; First Nat. Bank v. Shaw (Tex. Civ. App.) 260 S. W. 309; Newcomb v. Kloeblen, 39 L. R. A. (N. S.) 732; United States v. Bethlehem Steel Co., 205 U. S. 105, 27 S. Ct. 450, 51 L. Ed. p. 731.

It would be absurd to say where the contract requires a well to be begun within a certain time, and, not being pushed on with diligence, that a mere beginning of one well would satisfy the fulfillment of a contract for the development of oil wells in and upon a tract of 53,000 acres of land. Bear in mind, as stated, the construction of oil leases are in favor of the owner of the soil.

The jury was instructed to allow as offset for any damages which they might find $5,314, the amount of lease money which had been paid, and the value of the hole which had been drilled. Appellants paid 10 cents an acre for this lease. The evidence shows that they received some $35,000 or $40,000 off about 6,000 acres of this land for lease rentals. Bruni testified to familiarity with oil lease rentals paid during that time and that he had "never known of any lands going for less than 10 cents an acre." Appellee proved by Thomson that "wells are drilled in various sections of Texas, ranging from 1,300 to 2,000 feet deep, turnkey job, from $7,500 to $8,500, which includes derrick, pipe, and the complete well, equipped for pumping."

Effort was made to require appellants to produce their record, which they refused to do. If they refuse to produce records, and the jury allowed them a sum as an offset with much more than the naked hole drilled 1,600 feet, and has charged them the minimum price per acre for lease rentals, they certainly have nothing to complain of. Figuring this lease from February, 1919, to July, 1925, it will appear that the jury has allowed roughly $5,314 and $8,000 as credits and charged them at the rate of 10 cents an acre.

This court has never held that it is necessary to reform a contract in order to cancel it on the ground of fraud as claimed by appellants. Surety Co. v. Adams (Tex. Civ. App.) 278 S. W. 946. Reformation is only required in the enforcement of instruments; never for their destruction.

The appellants are in no position to complain at the court's charge on good faith, since they did not request one favorable to their view. Thompson v. Van Natta (Tex. Civ. App.) 277 S. W. 711. The charge given by the court on good faith is in consonance with the one approved in Street v. Masterson (Tex. Civ. App.) 277 S. W. 407.

I cannot agree that the court should have held the parties to the sole issue of good faith by drilling one well as a full compliance therewith, or given a charge to the jury to the same effect as to good faith in drilling one well.

Under the circumstances and under the facts developed it would be doing a useless thing to reverse and remand this case for another trial. Obviously there would be no lessee to finish the well started, much less to develop the 53,000 acres of supposed oil land. Where would this leave appellee? Consequently there is no lessee, the corporation is dead, and there is no survivor to carry out its obligations. To remand this case, therefore, would be to do an irreparable wrong to appellee. This feature was not in the other cases; it is a new disclosure rendering a reversal futile. It must follow, therefore, "as night follows the day," that to reverse and render is likewise an error; a fundamental error besides. The corporation has no legal existence. Corsicana Transit Co. v. Walton (Tex. Civ. App.) 189 S. W. 307; Id. (Tex. Com. App.) 222 S. W. 979.

My associate has written fully and said much by way of amplification, and given his conclusions and deductions from the testimony, in conflict with the jury's findings, but that duty already had been performed by the jury, whose function, only, was to pass upon, make the findings, and reconcile the testimony. Having performed that function, no mere conclusion of the court from the same testimony should be permitted to set aside the jury's findings and verdict. That is no function of an appellate court. This rule is too well settled to need the citation of authorities, since there is ample testimony shown to support the jury's findings. It is the duty of appellate courts to affirm judgments when possible to do so; not to render.

The Supreme Court has again approved a very recent opinion written by the distinguished Justice Speer for the Commission of Appeals, in the case of W. T. Waggoner Estate v. Sigler Oil Co., 284 S. W. 921. That opinion is so decisive of the similar questions of fact and law involved in this case as to really render further discussion of the subject unnecessary. It is on "all fours with it."

The prominent error, or at least one of them, shown in the opinion of the majority of this court, is in treating the facts and contending there was no actionable fraud,

but leaving fraud out of the case entirely. There are sufficient facts showing bad faith, misrepresentations, and fraud; therefore the finding of the jury on that question must not be set aside. The case of Waggoner Estate v. Sigler Oil Co., supra, is a splendid illustration of the right to forfeit an oil lease contract under reasons similar to the facts here developed, which primarily contemplated procuring the lease on the basis of fraud and bad faith, never intending to develop the lands for oil, but to sell it out to others and secure money in that way. A more easy and less expensive money making scheme than boring for oil. I quote from the syllabus of that opinion:

"In lease of land solely for mining and operation for oil, and chiefly in consideration of royalties, lessee has a determinable fee, ending, and authorizing cancellation, on breach of implied covenant for reasonable diligence in development, though there be no complete abandonment."

It is apparent, therefore, that there is no ground or good reason shown that will require this case to be reversed and rendered, but, on the contrary, it should be affirmed. I therefore file this as my dissent.